J-A06006-24

**NON-PRECEDENTIAL DECISION - SEE SUPERIOR COURT O.P. 65.37**

| | | |
|---|---|---|
| IN RE: ADOPTION OF G.W., A MINOR | : : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: FAYETTE COUNTY CHILDREN AND YOUTH SERVICES | | |
| | | No. 936 WDA 2023 |

Appeal from the Decree Entered August 2, 2023
In the Court of Common Pleas of Fayette County Orphans' Court at
No(s): 27 ADOPT 2022

| | | |
|---|---|---|
| IN RE: ADOPTION OF T.W., A MINOR | : : : : : : : : : : : : : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
| APPEAL OF: FAYETTE COUNTY CHILDREN AND YOUTH SERVICES | | |
| | | No. 937 WDA 2023 |

Appeal from the Decree Entered August 2, 2023
In the Court of Common Pleas of Fayette County Orphans' Court at
No(s): 28 ADOPT 2022

BEFORE: LAZARUS, P.J., PANELLA, P.J.E., and BECK, J.

MEMORANDUM BY LAZARUS, P.J.: **FILED: May 6, 2024**

Fayette County Children and Youth Services (CYS) appeals[1] from the decrees, entered in the Fayette County Orphans' Court, denying its petitions to involuntarily terminate the parental rights of C.W. (Mother) to her minor children, G.W. (born November 2014) and T.W. (born October 2018)

---

[1] On September 5, 2023, our Court, *sua sponte* consolidated the above-captioned appeals. **See** Pa.R.A.P. 513 (Court can consolidate cases on appeal that involve related parties and issues).

(collectively, Children).[2] The trial court concluded that CYS did not prove, by clear and convincing evidence, that Mother's rights should be terminated under 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), and (8) of the Adoption Act.[3] Because CYS has failed to provide this Court with sufficient documentation to conduct proper appellate review of whether it fulfilled its burden to terminate Mother's parental rights under subsection 2511(a), we are constrained to affirm.

Mother has a total of ten children; four of those children were privately adopted by a family in Westmoreland County (adoptive family).[4] In the instant matter, Westmoreland County Children's Bureau (WCCB) received a referral on May 14, 2021, that Mother had been arrested and charged with endangering the welfare of children, attempted robbery, and public intoxication.[5] On that day, Mother, who appeared to be intoxicated,[6]

_____

[2] The trial court, however, granted CYS' petitions to involuntarily terminate the parental rights of S.T. and T.W., fathers of G.W. and T.W., respectively. Neither father is a party to these appeals.

[3] 23 Pa.C.S.A. §§ 2101-2938.

[4] While four of Mother's other children were adopted, a fifth child was also living with the adoptive family.

[5] The July 9, 2021 adjudication and dispositional order also contains the following findings of fact: in April 2021, WCCB received a referral that Mother was using methamphetamines; Mother did not cooperate with drug testing; and, on May 5, 2021, police were called because Mother was impaired.

[6] Mother denied having consumed alcohol or that she was drunk when she went to the adoptive family's home on May 14, 2021. *See* N.T. Termination Hearing, 5/12/23, at 248.

attempted to break into the adoptive family's home while Children were with her. *See* N.T. Termination Hearing, 5/11/23, at 13-14. After Mother was taken into custody at the scene, she unsuccessfully instructed Children to open the door of the police cruiser so she could escape. *Id.* at 14. A WCCB supervisor testified that county records indicated Children were upset at the scene. *Id.*[7]

On May 14, 2021, emergency custody of Children was granted to WCCB, the county where the parties resided at the time. Children were originally placed in kinship care with their maternal aunt. *Id.* at 15. On May 17, 2021, Children were placed in foster care. *Id.* On July 9, 2021, Children were adjudicated dependent after the court found, by clear and convincing evidence, that they were without proper care or control necessary for their physical, mental, or emotional health or morals. *Id.* at 16; *see also* 42 Pa.C.S.A. § 6302. A caseworker scheduled a mental health evaluation, noting

---

[7] WCCB received two referrals listing Mother as the perpetrator of child abuse, in April and June of 2021, as a result of T.B. having excessive bruises on her shins, chest, back, arm, and upper leg. *Id.* at 21, 25-26. However, those reports were eventually deemed unfounded. One of the referrals reported that Mother was using crystal methamphetamine and was beating Children. Children presented with injuries from the incidents. Although the reports were deemed unfounded, WCCB supervisor Molly Clayton testified, "[j]ust because something is unfounded, doesn't mean the injuries did not occur, it just means they did not rise to the level of causing impairment, or significant pain." N.T. Termination Hearing, 5/11/23, at 34. *See also* WCCB Dependency Petition, 5/26/21, at ¶6 (indicating referrals regarding bruising and marks on T.W. "raise[d] concerns regarding adequate supervision and appropriate parental response to [] child"). The referrals and reports were not included in the record on appeal, which we discuss further *infra*.

that he had "concerns for Mother's mental health, due to erratic behavior," and, despite the fact that WCCB had contacted ARCPoint Labs to provide drug and alcohol testing for Mother, attempts at testing were unsuccessful. *See* Recommendation for Adjudication and Disposition, 7/9/21, at 1; *see also* WCCB Dependency Petition, 5/26/21, at 2. *See* Recommendation for Adjudication and Disposition, 7/9/21, at 2 (noting Mother has lengthy history of drug and alcohol use and "continues to demonstrate impaired conditions"). Mother's housing at the time was deemed "appropriate." *Id.*

In July 2021, Mother entered a guilty plea to criminal trespass and public drunkenness and was incarcerated. *See* N.T. Termination Hearing, 5/12/23, at 232. As a bond condition, the court entered a no-contact order, effective until August 1, 2021,[8] against Mother with regard to Children. Supervised visits with Mother were ordered if/when the bond condition changed. *See* Recommendation for Adjudication and Disposition,[9] 7/9/21, at 1, 3. The permanency plan listed the goal as return to parent, with a projected goal date of January 2022. *Id.* at 3.

WCCB prepared a family service plan for Mother, which she signed, with the following objectives: (1) undergo drug and alcohol evaluation and comply with recommended treatment; (2) undergo mental health/psychiatric evaluation and comply with recommended treatment; (3) participate in

_____

[8] Mother was released from jail in August of 2021.

[9] The trial court adopted the hearing officer's recommendation for adjudication and disposition, by order, on July 14, 2021.

- 4 -

parenting assessment; and (4) participate in parenting instruction until successful completion. *See* Adjudication/Dependency Dispositional Order, 7/9/21, at 4 (Petitioner's Exhibit 3); *see also* N.T Termination Hearing, 5/11/23, at 16-17, 22; Trial Court's Findings of Fact, 8/4/23, at ¶ 10.

WCCB supervisor Molly Clayton testified that Mother successfully completed five out of twenty-seven drug screens.[10] *Id.* at 17-18. Ms. Clayton also testified that in August and September 2021, Melissa Franks, Psy.D., completed psychological evaluations of Mother, that Mother was cooperative, and that Mother attended four of five scheduled mental health sessions. *Id.* at 17, 22. Ms. Clayton testified that she was told Mother "might be able to be discharged in November of 2021, if she continued [with treatment]." *Id.* at 17. Finally, Ms. Clayton testified that Mother did not disclose to Dr. Franks that she had been diagnosed with schizophrenia in 2018 by Southwestern Pennsylvania Human Services, Inc. (SPHS). However, Mother testified that she was unaware of her schizophrenia diagnosis until she read the evaluation and that she never saw a doctor at SPHS. *Id.*, 5/12/23, at 242; *id.* at 264 (Mother testifying "No one has ever told me that I was diagnosed with schizophrenia[,] but it's in that report. . . . I don't know of any diagnosis for me recent saying anything."); *id.* at 241 (Mother asking counsel on cross-

---

[10] Mother self-reported that she had two drug and alcohol evaluations completed in June/July 2021 (Westmoreland County) and January 2022 (Fayette County), however WCCB supervisor Molly Clayton testified she "d[id]n't believe that [Mother] ever provided [her] agency with a copy of that." *Id.* at 25. However, Mother testified that CYS never told her to get a second drug and alcohol test, another parenting certificate, or another mental health evaluation in Fayette County. *Id.*, 5/12/23, at 263.

examination, "Who diagnosed me with schizophrenia, that's like what your report says, I want to know who diagnosed me with schizophrenia. I've never seen [any] paperwork saying that.").

On December 15, 2021, upon agreement and consent of the Honorable Linda Cordaro of the Court of Common Pleas of Fayette County, the case was transferred from WCCB to CYS because Mother and Children had relocated to Fayette County. Custody of Children was similarly transferred to Fayette County CYS. At the time the case was transferred to Fayette County, Mother was on house arrest for burglary charges and was renting a house on Pennsylvania Avenue, in Uniontown, Fayette County. **See** N.T. Termination Hearing, 5/12/23, at 207; **id.** at 244 (Mother testifying she left Westmoreland County and moved to Fayette County in November 2021).

Following the transfer of Mother's case to Fayette County in December 2021, CYS prepared a family service plan, which required Mother

> [o]btain and maintain appropriate housing, free and clear of any safety o[r] health hazards[; a]ssure [C]hild[ren are] seen by the pediatrician as needed[;] cooperate with [CYS; d]emonstrate appropriate parenting[; a]ddress mental health concerns [by] successfully completing an assessment through a mental health facility of choice [and] openly communicat[e with] the mental health care provider in regards to personal and pertinent information they request [and] successfully complet[e] recommended treatment through a mental health care provider based on their assessment[; a]ddress drug and alcohol issues [by] successfully completing an assessment through a drug and alcohol provider of choice [and that is approved by the agency,] follow all recommendations made by the drug and alcohol provider[,] agree to scheduled and unscheduled urine and/or hair screenings conducted by [CYS,] openly communicat[ing] with the drug and alcohol provider regarding all personal and pertinent information they request[,] successfully complet[e] recommended treatment

though drug and alcohol provider based on their assessment[, and] enter into inpatient if unable to maintain sobriety.

CYS' Petition to Terminate Parental Rights, 7/5/22, at 5.

Mother tested positive for methamphetamines in December 2021. As a result of this positive test, CYS informed Mother that she needed to complete, in Fayette County, a drug and alcohol assessment, follow all recommendations by an approved provider, schedule urine and/or hair screenings, and openly communicate with the drug and alcohol provider regarding all personal and pertinent information they request. *See* N.T. Termination Hearing, 5/11/23, at 133-34. Mother was also told by CYS that she needed to complete another mental health evaluation. *Id.* at 137.

In February and May of 2022, JusticeWorks coordinated with CYS to conduct Mother's drug and alcohol tests; the testing occurred from February 2022 through May 2022. *See* Petitioner's Exhibit 4, at 1-2. Out of a total of 70 tests that were administered, Mother tested positive 2 times (TCA (5/17/22)[11] and alcohol (5/10/22)) and negative 44 times for drugs and alcohol, along with 16 missed tests, 4 refused tests, 4 inconclusive tests. *Id*.

Mother was charged with theft by unlawful taking and escape arising from an incident that occurred on May 21, 2022. She was incarcerated in the Fayette County Prison, but was transferred to a state facility to serve a 15-30 month sentence on prior charges. On July 5, 2022, CYS filed petitions to

_____

[11] On this date, when a JusticeWorks staff member told Mother she had tested positive, Mother allegedly threw her urine at the staff, telling them that they were lying to her about the positive result. *See* Petitioner's Exhibit 4, at 2.

involuntarily terminate Mother's parental rights to Children pursuant to 23

Pa.C.S.A. §§ 2511(a)(1), (2), (5), and (8).[12]  In its petitions, CYS alleged that

_____

[12] Pursuant to 23 Pa.C.S.A. § 2511:

(a) General rule. — The rights of a parent in regard to a child may be terminated after a petition filed on any of the following grounds:

(1) The parent by conduct continuing for a period of at least six months immediately preceding the filing of the petition either has evidenced a settled purpose of relinquishing parental claim to a child or has refused or failed to perform parental duties.

(2) The repeated and continued incapacity, abuse, neglect or refusal of the parent has caused the child to be without essential parental care, control[,] or subsistence necessary for his physical or mental well-being and the conditions and causes of the incapacity, abuse, neglect[,] or refusal cannot or will not be remedied by the parent.

\*     \*     \*

(5) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency for a period of at least six months, the conditions which led to the removal or placement of the child continue to exist, the parent cannot or will not remedy those conditions within a reasonable period of time, the services or assistance reasonably available to the parent are not likely to remedy the conditions which led to the removal or placement of the child within a reasonable period of time[,] and termination of the parental rights would best serve the needs and welfare of the child.

\*     \*     \*

(8) The child has been removed from the care of the parent by the court or under a voluntary agreement with an agency, 12 months or more have elapsed from the date of removal or placement, the conditions which led to the removal or placement of the child continue to exist and

*(Footnote Continued Next Page)*

Mother "has not successfully completed the goals of the service plan and has not remedied the conditions which led to the placement of the children." *Id.* Although CYS recognized Mother completed a drug and alcohol assessment in June of 2021, undergone a mental health evaluation, attended parenting classes, and visited Children, it was noted that "[M]other was only minimally compliant with drug screens." *Id.*

On May 11-12, 2023, the court held termination hearings,[13] during which WCCB supervisor Molly Clayton, Justice Works Youth Care (JWYC) family resource specialists Anastasia Wooser and Breanna Lucas, JWYC program director Laura Daumit, Child's Place parent educator Marlena Theodori, CYS supervisor Jennifer Guseman, Fayette County Prison counselor Jamee Waligura, and Mother each testified.[14]

_____

termination of parental rights would best serve the needs and welfare of the child.

23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), and (8).

[13] Children were represented by guardian *ad litem*, John A. Kopas, Esquire, and attorney, David Tamasy, Esquire, at the termination hearings. *See* 23 Pa.C.S.A. § 2313(a) (children have statutory right to counsel in contested involuntary termination proceedings), and *In re K.R.*, 200 A.3d 969 (Pa. Super. 2018) (en banc), *but see In Re: T.S., E.S.*, 192 A.3d 1080, 1092 (Pa. 2018) ("[D]uring contested termination-of-parental-rights proceedings, where there is no conflict between a child's legal and best interests, an attorney-guardian *ad litem* representing the child's best interests can also represent the child's legal interests."). Attorney Kopas also had represented Children in the related dependency matter.

[14] Mother was incarcerated at the time of the termination hearings, but was present on both days of hearings and testified on the second day. Mother was represented by Phyllis Jin, Esquire, at the hearing.

During her incarceration in 2022, Mother had 15-minute Zoom visits with Children, supervised by JWYC resource specialist, Breanna Lucas, every other Wednesday beginning in August. The JWYC resource specialist testified that T.W. was "very excited" for the Zoom visits and would "mostly . . . say I love you" back to Mother, while G.W usually "does not want to engage" in the visits. N.T. Termination Hearing, 5/11/23, at 95-96; *see id.* at 168 (G.W. "shut[s] down . . . [h]e is almost fearful."); *id.* at 173 (G.W. "doesn't even want to participate in some of the visits . . . [o]r he won't even acknowledge [Mother]."). Ms. Lucas testified that during these visits Mother commented to Children that foster parents should not be cutting T.W.'s hair, blamed caregivers for not giving her gifts to Children, that she would ask G.W. about school and soccer and that they would pray together, and that, since Christmas, the "majority of the visits were appropriate." N.T. Termination Hearing, 5/11/23, at 86-95.

JWYC staff member Anastasia Wooster, who drug tested Mother for three months in 2022, testified that Mother would "consistently have random men in her house [and] would leave her front door unlocked for the homeless people to sleep on her front porch." N.T. Termination Hearing, 5/11/23, at 53; *id.* at 61 (JWYC worker testifying there would be one to three random males in Mother's home every time she conducted drug tests four times/week). Ms. Wooster also testified that Mother accused CYS of withholding information about her case and forging information, stated that CYS was "in the business of stealing babies," alleged that CYS and

- 10 -

JusticeWorks lied about her in court, and accused staff of tricking her when she was drug testing. *Id.* at 51, 53; *see also* Petitioner's Exhibit 4, undated, at 3-4. During a May 17, 2022 visit, Ms. Wooster testified that Mother talked to staff about her sex life, "fondled" the toes of a staff member, used inappropriate language for one's private parts, became irate after she was informed her drug screen was positive and, as a result, threw her urine on the caseworker. *See* N.T. Termination Hearing, 5/11/23, at 40-59. The urine-throwing incident resulted in Mother being charged with aggravated assault and harassment; she was ultimately acquitted of the assault, but found guilty of harassment. *Id.* at 63, 233.[15]

CYS caseworker Jennifer Guseman testified at the termination hearing that Mother refused to sign off on any of the three service plans they crafted, "saying she completed all her goals in Westmoreland County." N.T. Termination Hearing, 5/11/23, at 132, 144. Caseworker Guseman conducted a home study, concluding Mother's Uniontown home was "appropriate," that Children's rooms were "set up nicely" and that she had "working utilities." *Id.* Ms. Guseman testified that Mother initially refused to sign releases so that CYS could coordinate with Fayette County Drug and Alcohol to communicate

---

[15] Moreover, as a result of the home visit incident, JWYC was no longer willing to drug test Mother and no longer willing to supervise visits at the home or with only one caseworker present. Mother was also required to sign a "Client Expectation" contract due to the incident, which outlined JWYC's expectations and rules for visits in order "to ensure a safe and successful visit." JWYC Client Visit Expectations Form, Exhibit 6 to Dependency Petition, 1/15/23, at 1.

- 11 -

any concerns, most notably Mother's positive 12/21/21 drug screen for methamphetamines. *Id.* at 134-35. Caseworker Guseman also testified that she had been contacted multiple times by JusticeWorks staff, who let her know that Mother appeared impaired, smelled of alcohol, and exhibited overall "erratic" behavior during their visits. *Id.* at 136. A Westmoreland County mental health evaluation provided to CYS caused Caseworker Guseman to have "concerns [that Mother] wasn't open and honest with her evaluator" regarding her alcohol consumption. *Id.* at 137.

Caseworker Guseman further testified that Mother did ultimately complete parenting classes through the Crime Victims Center in Westmoreland County, however CYS continues to have concerns about Mother's ability to parent. *Id.* at 139. Caseworker Guseman also testified that Children are safe in their current placement, where their needs are being met. *Id.* at 146. T.W. is "quite comfortable" with her foster family. *Id.* Although CYS staff admitted that Mother shares a "connection" with Children, that bond is not always healthy. *Id.* at 147, 162.

Marlena Theodori, a parenting educator for Child's Place, testified that she provided one-to-two-hour group parenting sessions (Triple P Program) to Mother and other Fayette County inmates in July and August of 2022. *Id.* at 106. As an evidence-based program, the sessions were geared toward enhancing and developing parenting strategies and skills so that the parent-inmates may form better bonds with their children. *Id.* at 105-106. Although Ms. Theodori testified that Mother "seemed open and willing to discuss []

topics . . . and was engaged during the[] classes," *id.* at 124, Mother refused to implement a "planned ignoring" technique with Children or set a realistic parenting goal, an exercise encouraged with the parents at group sessions. *Id.* at 111. Ms. Theodori testified Mother was noncompliant because she said that specific exercise was "unrealistic and there was no point in doing that while she was . . . [in] jail." *Id.* at 110-11. *See also id.* at 111 (Ms. Theodori stating Mother "can be very defensive . . . [o]r just very dismissive of anything [the parent educator] would try to give").

At an August 10, 2022 parenting session, Ms. Theodori testified that Mother got "a little bit hostile" toward her when she asked to observe Mother's Zoom visits with Children, stating that Mother "was very upset that . . . I wanted to come in and observe the video conference with her and her kiddos." *Id.* at 114. Ms. Theodori testified that Mother told her "she did not want to do it [anymore, and s]aid [`]I'm done.[']" *Id.* As a result, Mother failed to complete the required six-week parenting program, attending only three sessions in total. *Id.* at 112. *See also id.* at 127 (Ms. Theodori testifying she did not think Mother received anything positive from classes or absorbed instructions from sessions); *but see id.* at 124 (Ms. Theodori testifying Mother would "talk about things [they worked on in sessions] and she would say, `well[,] I've tried that[,] and it didn't work.'").

Jamee Waligura, a counselor at Fayette County prison who supervised Mother's Zoom visits with Children,[16] testified that Mother's first few remote visits with Children were "very rocky [in the sense that Mother had] some outburst[s]," and would say inappropriate things. N.T Termination Hearing, 5/12/23, at 190-91. However, he testified that Mother "tries very hard to . . . be engaged [with Children during the visits]." *Id.* at 202. Moreover, Mr. Waligura testified that Mother's visits positively progressed in the two and a half months prior to the termination hearings.

Finally, Mother testified that she participated in outpatient counseling at SPHS following a recommendation after her psychiatric evaluation. *See id.* at 242. Mother testified that she saw Dr. Susanne DeMarco for sessions "every week [for two to three months] until [Mother] was incarcerated." *Id.* Mother also testified that any men that were in the home when the Justice Works staff member conducted home visits were either the Children's uncles or their aunts' boyfriends. *Id.* at 208. Mother also testified that she had furnished rooms for Children at the Pennsylvania Avenue home and that the deadlocks on the bedroom, bathroom, and closet doors that staff members saw during in-home visits were already installed when she began renting the house. *Id.* at 210. Mother testified that she bonded with the JusticeWorks provider who "was almost getting close to feeling like family." *Id.* at 211. Mother also

---

[16] While Mr. Waligura is "present" during the Zoom calls between Mother and Children from prison, he does not participate in the visits like JWYC providers do. *Id.* at 189. *See also id.* (Mr. Waligura testifying "[i]n the beginning of the [Zoom call] whenever we sign in, they will see my face because I will say good morning . . . [a]nd then I sit in my chair").

testified that she filed a grievance when she was not permitted to finish parenting classes in prison, that she "definitely would not have quit parenting classes, [but] just told [the parenting class instructor] that she wasn't welcome to sit in [on her visits with Children]." *Id.* at 221, 249. Mother later reenrolled in a different parenting program, which she completed in April 2023. *See id.* at 222.

Mother testified that Fayette County CYS did not include her in developing its family service plan or permanency plan and never was asked to sign it, but first learned of the plan when it was handed to her. *Id.* at 226. Moreover, Mother testified that CYS Caseworker Guseman never told Mother that she had to complete another parenting plan in Fayette County even though she had already completed her case plan objectives in Westmorland County. *Id.* at 263. Mother stated that she only has the best interests of Children at heart, that upon release from jail she will seek appropriate housing,[17] and that when she was not incarcerated she had worked for a temporary agency and a personal care home agency. *Id.* at 228-29.

Mother further testified that she attends weekly Alcoholics Anonymous (AA) and Narcotics Anonymous (NA) meetings in jail and had another drug and alcohol evaluation conducted in January 2022 after having a positive urine test in December 2021. *Id.* at 236, 239. Mother admitted that she has relapsed three times with consuming alcohol, *id.* at 247, 253, and that she

_____

[17] While incarcerated, Mother testified that she had been evicted from the Pennsylvania Avenue home. *Id.* at 237.

also made the following comments during a visit with JWYC supervisor Tonya Wright—(1) "dad had to go to Mars to start a new language" and (2) "she thinks it's good and bad spirits [that] jump inside of us at different times." *Id.* at 257-58. Mother testified that professionals told her she did not need to complete further drug and alcohol or mental health services. *Id.* at 252.

At the conclusion of the hearing, the court ordered the parties to submit, within 30 days, proposed findings of fact, conclusions of law, and arguments in support of their respective positions. N.T. Termination Hearing, 5/12/23, at 266.[18] The court also incorporated the related dependency petitions and orders and any transcripts from relevant dependency proceedings into the instant record. *Id.* at 181-82. *See also id.* at 182 (trial judge agreeing to incorporate "whatever is in the official file at the clerk of courts office" in the dependency matter).[19]

On August 2, 2023, the orphans' court entered decrees denying CYS' petitions to involuntarily terminate Mother's parental rights to Children, concluding that Mother "immediately began to work on the goals of the [case] plan" once the case was opened. Trial Court Findings of Fact, 8/4/23, at 8

---

[18] The court also ordered that Mother's visitation be expanded to two times each week for 15 minutes per visit and that foster mother participate in the visits and provide Mother with a "daily recap of the [C]hildren's activities." *Id.* at 267.

[19] As discussed *infra*, several critical documents are not included in the certified record on appeal. For instance, there is no transcript from a May 18, 2021 shelter care hearing that was referenced in Westmoreland County Children and Youth Service's Dependency Petition.

(noting Mother underwent mental health treatment and attended parenting classes). The court also took note that Mother "has been consistent with her visitation with [Children]," and, even while she was incarcerated, "Mother utilized the opportunities for visitation [] and [] maintained contact with [Children]." *Id.* The court credited Mother for completing a mental health evaluation, drug and alcohol evaluations, and parenting classes. *Id.* at 9. Similarly, the court recognized that Mother has been attending AA and NA meetings while in jail. *Id.* at 10.

In its findings of fact, the court referred to March 2022, October 2022, January 2023 and April 2023 permanency review hearings at which Mother was deemed to be moderate to minimally compliant with her Fayette County family service plan. *Id.* at 5. The court also stated that although "Mother's conduct in this case certainly has been bizarre at times and unacceptable . . . these incidents do not appear to be the norm and do not evidence that Mother cannot or will not remedy the conditions which cause the [Children's] removal." *Id.* at 11.

CYS filed a timely notice of appeal. On August 22, 2023, CYS filed its Pa.R.A.P. 1925 concise statements of errors complained of on appeal. *See* Pa.R.A.P 1925(a)(2).[20] CYS presents the following issues for our consideration:

---

[20] CYS failed to file its Rule 1925 statements contemporaneously with its notices of appeal pursuant to Pa.R.A.P. 1925(a)(2). However, we will not find
*(Footnote Continued Next Page)*

> (1)  Whether [CYS] proved by clear and convincing evidence that the parental rights of [] Mother of [Children] should be involuntarily terminated?
>
> (2)  Whether the [orphans'] court improperly excluded evidence of Mother's methamphetamine use?
>
> (3)  Whether the denial of the petitions for termination of parental rights violates the Adoption and Safe Families Act.

Appellant's Brief, at 5.[21]

> We note that:
>
> In a proceeding to terminate parental rights involuntarily, the burden of proof is on the party seeking termination to establish by clear and convincing evidence the existence of grounds for doing so.  The standard of clear and convincing evidence is defined as testimony that is so "clear, direct, weighty[,] and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue."  It is well established that a court must examine the individual circumstances of each and every case and consider all explanations offered by the parent to determine if the evidence in light of the totality of the circumstances clearly warrants termination.

*In re Adoption of S.M.*, 816 A.2d 1117, 1122 (Pa. Super. 2003) (citation and quotation marks omitted).  We review a trial court's decision to involuntarily terminate parental rights for an abuse of discretion or error of law.  *In re A.R.*, 837 A.2d 560, 563 (Pa. Super. 2003).  Our scope of review

---

waiver because there has been no allegation of prejudice from the late filings. *See In re K.T.E.L.*, 9883 A.3d 745, 747 n.2 (Pa. Super. 2009); *see also In the Int. of R.R.D.*, 300 A.3d 1077, 1080-81 (Pa. Super. 2023).

[21] Notably, Children's attorney, David Tamasy concurs with CYS' first issue—that the trial court erred by not terminating Mother's parental rights under section 2511(a).  However, he does not believe that the court erred with regard to CYS' issues 2 and 3.

is limited to determining whether the trial court's order is supported by competent evidence. ***Id.***

A party seeking termination of parental rights bears the burden of proving, by clear and convincing evidence, that at least one of eight grounds for termination under section 2511(a) exists, and that termination promotes the emotional needs and welfare of the child set forth in section 2511(b). Parental rights may be involuntarily terminated where any one subsection of section 2511(a) is satisfied, along with consideration of the subsection 2511(b) provisions. ***In re Adoption of R.J.S.***, 901 A.2d 502, 508 n.3 (Pa. Super. 2006).

Mother has been incarcerated twice while Children have been in placement.[22] The first incarceration was directly related to the reason Children were removed from her care and adjudicated dependent.

> This Court has long held that a parent's absence or failure to support his or her child due to incarceration is not, in itself, conclusively determinative of the issue of parental abandonment. ***In re Adoption of McCray***, [] 331 A.2d 652, 655 (Pa. 1975). Indeed, incarceration alone is not an explicit basis upon which an involuntary termination may be ordered pursuant to [s]ection 2511 of the Pennsylvania Adoption Code. ***In re C.S.***, 761 A.2d 1197, 1201 [] (Pa. Super. 2000) (en banc). Rather, we must inquire whether the parent has utilized those resources at his or her command while in prison to continue and pursue a close

---

[22] Due to the state of the record, we can only surmise that Mother was first incarcerated on May 15, 2021 (instant matter) and was released sometime in late July or early August 2021. Mother was reincarcerated on June 13, 2022, and was still in prison at the time of the termination hearings in May 2023. Mother testified that her minimum release date was February 26, 2024, and that her maximum date is May 2024. ***See*** N.T. Termination Hearing, 5/12/23, at 243.

relationship with the child or children. ***McCray***, ***supra*** at 655. An incarcerated parent desiring to retain parental rights must exert him or herself to take and maintain a place of importance in the child's life. ***Adoption of Baby Boy A.***, [] 517 A.2d 1244, 1246 (Pa. 1986).

***In re R.I.S.***, 36 A.3d 567, 573 (Pa. 2011).

Here, Mother has consistently participated in her biweekly 15-minute Zoom visits with Children while incarcerated. ***See*** N.T. Termination Hearing, 5/12/23, at 190-99. In addition, there was testimony that Mother sent letters, coloring pages, and books to Children while she has been in prison. ***Id.***, 5/11/23, at 175. ***See also*** Trial Court Finding of Fact, 8/4/23, at 4 (Mother "attempted to send hand-made jewelry to [C]hildren"). ***See In re R.I.S.***, ***supra*** at 574 ("[W]e reiterate the definitive principle that when a parent uses the opportunities that are available in prison to make sincere efforts to maintain a place of importance in the lives of . . . her children, incarceration **alone** will not serve as grounds for the involuntary termination of . . . her parental rights.") (emphasis added).

While "the fact of incarceration alone neither compels nor precludes termination of parental rights," ***In re D.J.S.***, 737 A.2d 283, 287 (Pa. Super. 1999), "[t]he cause of incarceration may be particularly relevant to the [s]ection 2511(a) analysis, where imprisonment arises as a direct result of the parent's actions which were 'part of the original reasons for the removal' of the child." ***In re Z.P.***, 994 A.2d 1108, 1120 (Pa. Super. 2010), citing ***In re C.L.G.***, 956 A.2d 999, 1006 (Pa. Super. 2008) (en banc).

CYS asserts that Mother has been inconsistent in following her mental health assessment recommendations despite being diagnosed with trauma,

stress-related disorder, alcohol use disorder, severe and sustained remission, and schizophrenia.[23] **See** N.T. Termination Hearing, 5/11/23, at 167. Mother had only confirmed 2 of the 6 scheduled in-home visits and has engaged in "inappropriate verbal and physical behaviors with [the JWYC Visitation House workers, including] behaviors that were sexual in nature[.]" CYS' Petition to Terminate, 7/5/22, at 6 (unpaginated);[24] **see also** Petitioner's Exhibit 4, undated, at 3-4 (indicating Mother accused JWYC workers of "spicing up" her urine, told staff how much she loved them, consistently had random men in her house, told JWYC worker to not send in urine test and to keep it a secret, left front door unlocked for homeless people, accused caseworkers of withholding information about her case and forging documents, accused staff of tricking her when they conducted drug tests, objectified staff, talked inappropriately in front of Children, and talked to staff about her sex life). Mother, on the other hand, disputed much of this testimony. **See** N.T. Termination Hearing, 5/12/23, at 203-64.

_____

[23] Caseworker Guseman also testified that at some point, Mother had suffered a brain aneurism. Ms. Guseman testified that Dr. Franks, who allegedly performed Mother's August and/or September 2021 psychiatric evaluations, suggested Mother have neuropsychological testing to determine if she is experiencing any residual effects from that trauma. **See** N.T. Termination Hearing, 5/11/23, at 160-61, 170. Again, the record does not include either of the psychiatric evaluations performed by Dr. Franks on Mother so we cannot assess whether this is, in fact, an accurate statement.

[24] One caseworker testified that Mother told her she used to be a sex slave when she was a child in foster care. **See** N.T. Termination Hearing, 5/11/23, at 75.

Based upon our comprehensive review of the record, we conclude that the record on appeal lacks evidence to prove, clearly and convincingly, that Mother has failed to address and fulfill her mental health or drug and alcohol goals under either the Westmoreland County or Fayette County service plans. Specifically, CYS has not provided this Court with sufficient documentation[25] to satisfy its burden to terminate Mother's parental rights under subsection 2511(a). Those missing documents include, but are not limited to: Mother's permanency review hearing orders from Westmoreland and Fayette Counties; any mental health evaluations and recommendations regarding Mother from Westmoreland County; any drug and alcohol evaluations and recommendations regarding Mother from Westmoreland County; Dr. Franks' two mental health evaluations of Mother; SPHS' mental health evaluation of Mother (containing schizophrenia diagnosis); and Mother's criminal record.

_____

[25] In addition to witness testimony at the termination hearings, CYS submitted the following exhibits that were admitted into evidence at the termination hearing on May 11, 2023, and are included in the certified record on appeal:

- Verified Return of Service for T[].W[].;
- Proof of Publication for S[].T[].;
- Order of Adjudication of July 9, 2021;
- JusticeWorks drug test dates;
- A-K Photos of Locks;
- Client visit expectations;
- JusticeWorks Policies of Visitation;
- JusticeWorks list of visits;
- JusticeWorks overview of concerns; and
- Quest Lab Report 12/21/21.

Exhibit Receipt of Petitioner's Exhibits, 8/3/23. All of these exhibits, save for the adjudication of delinquency order, are from Fayette County.

CYS' appellate brief and its witnesses at the termination hearing repeatedly reference Mother's 2018 schizophrenia diagnosis by SPHS, her consistent refusal to take medications to manage her mental health issues, two psychiatric evaluations conducted by Dr. Franks in 2021, and several of Mother's mental health and drug and alcohol evaluations indicating whether further treatment was recommended or necessary.[26] None of that documentation has been included in the certified record for our consideration, significantly hindering our appellate review.[27] *See* N.T. Termination Hearing, 5/11/23, at 27-28 (WCCB supervisor Molly Clayton testifying, while she "did not personally follow-up" with Dr. Franks about a concern she had regarding an August 2021 phone conversation with Mother, another WCCB "case[]worker did reach out to [Dr.] Franks about the phone call" but Clayton

---

[26] While we are aware that several of these documents may be part of the adoption docket in Mother's case in Westmoreland County, merely because the life of a termination of parental rights case may span multiple counties does not relieve CYS of its duty to ensure that it is able to provide this court with all information necessary for a determination as to whether termination is proper. *See In re Adoption of L.A.K.*, 265 A.3d 580, 591-92 (Pa. 2021) ("significant and permanent consequences for both the parent and child can follow the termination of parental rights[, and,] recogni[zing] the gravity attendant to the termination of parental rights, the moving party must establish the statutory grounds by clear and convincing evidence . . . that is . . . so [] 'clear, direct, weighty[] and convincing as to enable the trier or fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue.") (citations and quotation marks omitted).

[27] In fact, save for a July 9, 2021 adjudication and dispositional order, the record is nearly devoid of any information speaking to Mother's compliance level with her service plan objectives from the date her first plan was ordered in Westmoreland County until the case was transferred to Fayette County.

didn't "know the specific conversation that the case[]worker and [Dr.] Franks had."). The fact that record evidence indicates that Mother had, or almost had, almost achieved her goals prior to the case being transferred, further gives us pause. **See** N.T. Termination Hearing, 5/11/23, at 17 (Ms. Clayton testifying she was told Mother "might be able to be discharged in November of 2021, if she continued [with treatment]"); **Id.** at 17; **see also** Recommendation for Adjudication and Disposition, 7/9/21, at 3 (WCCB permanency plan listing goal as return to parent, with projected goal date of January 2022).

Our standard of review is well-established. As an appellate court we must accept the findings of fact and credibility determination of the trial court if they are supported in the record. **In re Adoption of B.G.W.**, 206 A.3d 576, 582 (Pa. Super. 2019). Moreover, unlike trial courts, "appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents." **Id.**

We remind CYS that, as the appellant, it bears the responsibility to ensure that the certified record is complete in order for our Court to conduct proper appellate review. **See In re R.N.F.**, 52 A.3d 361, 364 (Pa. Super. 2012); **see also** Pa.R.A.P. 1921, Note ("Ultimate responsibility for a complete record rests with the party raising an issue that requires appellate court access to record materials.") (citation omitted). Although the record bears out the

fact that Children were removed from Mother's care based on mental health and drug/alcohol issues in 2021, we are unable to assess whether Mother has, is able to, or will remedy those conditions or causes of her incapacity, *see* 23 Pa.C.S.A. § 2511(a)(2), whether those conditions continue to exist, *id.* at §§ (a)(5), (8), and whether termination would best serve Children's needs and welfare. *Id.*

As CYS notes in its appellate brief, under subsection (a)(1), "the [c]ourt should not only look at the six (6) month period prior to the filing of the [termination p]etitions[, but i]nstead, the totality of the circumstances must be considered." Appellant's Brief, at 14, citing *In re: Bowman (Appeal of Shuey)*, 666 A.2d 274 (Pa. 1995). We agree. Using a totality of the circumstances approach, we are required to consider Mother's actions over the life of the case, which necessarily includes the level of her compliance regarding the goals set out for her in Westmoreland County, as well as her compliance levels in Fayette County.

With that standard in mind, we are constrained to affirm the orphans' court's determination that CYS did not prove that termination was warranted under 23 Pa.C.S.A. §§ 2511(a)(1), (2), (5), (8).[28] Considering the inadequate

_____

[28] In particular, we note that subsection 2511(a)(8) does not require an evaluation of Mother's willingness or ability to remedy the conditions that led to placement of her Children. *See In re In the Interest of S.H.*, 879 A.2d 802, 807 (Pa. Super. 2005). Rather, it requires that the conditions continue to exist. *Id.* Without the pertinent information in the record—specifically Mother's mental health diagnoses are and any recommended treatments—we simply cannot assess her level of compliance and willingness to remedy the conditions that led to Children's placement.

record on appeal, we are simply unable to assess whether Mother has been "either unable or unwilling to apply the instruction given" in light of the services provided to her. Appellant's Brief, at 15. Relatedly, but equally important, we are unable to determine whether the trial court's findings of fact and credibility determinations[29] are supported in the record. *In re Adoption of B.G.W.*, *supra*.[30]

_____

[29] We note that even though the trial court ruled in Mother's favor by denying CYS' petitions to terminate, it surprisingly made the following findings of fact that contradicted Mother's own testimony:

- "Mother stated that she leaves the door to her front porch unlocked so that if anyone is homeless, they may sleep on her couch there[;]"

- "Mother consistently made inappropriate comments to Justice[]Works staff during supervised visits[;]"

- "Mother refused to complete the [Triple P Parenting] sessions;"

- "Caseworker [] Guseman . . . prepared and reviewed a Family Service Plan with Mother . . . at which time she refused to sign the plan, saying that she completed her goals in Westmoreland County[;]"

- "Mother refused to sign [an updated drug and alcohol assessment] release[;]" and

- "Mother was refusing medication management for her diagnosis of schizophrenia."

Trial Court Findings of Fact, 8/4/23, at 3-4. *But see* N.T. Termination Hearing, 5/12/23, at 208, 211, 221, 226, 242, 249, 252, 263-64.

[30] In light of our disposition, we need not address whether the court erred in terminating Parents' parental rights pursuant to section 2511(b) or whether the court's order violates the Adoption and Safe Families Act. *See In re Adoption of B.G.S.*, 245 A.3d 700, 705 (only if court determines parent's conduct warrants termination of his or her parental rights does court engage

*(Footnote Continued Next Page)*

Decrees affirmed.[31]

Panella, P.J.E., joins this Memorandum.

Beck, J., files a Dissenting Memorandum.

_____

in second part of termination analysis under section 2511(b)—determination of needs and welfare of child under best interests of child standard) (citation omitted).

As to CYS' evidentiary issue regarding evidence of Mother's methamphetamine use, we find no merit to this claim. CYS contends that the trial court "improperly disallowed the proffered evidence" where an admission or denial of methamphetamine use by Mother "would be an important fact in the CYS case to prove that Mother has not resolved her substance abuse issue." Appellant's Brief, at 21. Although the trial judge did ask counsel to "[p]lease move on," during cross-examination of Mother, the court did so only *after counsel asked Mother four times* if she had consumed methamphetamines in December 2021. **See** N.T. Termination Hearing, 5/12/23, at 246. Moreover, the court made a finding of fact that Mother tested positive for methamphetamines at December 21, 2021 drug screen. **See** Trial Court Findings of Fact, 8/4/23, at 3. Thus, even if the court improperly stopped counsel from asking Mother a fifth time if she had used methamphetamines in December 2021, the error was harmless where the trial court found, in fact, that she had tested positive for the drug.

[31] We would be remiss if we did not recognize that this case presents a unique factual history where: Mother parented G.W. for more than 6½ years and T.W. for more than 2½ years, albeit not without prior agency involvement, before their current dependency adjudication and placement; Mother was incarcerated more than once (and, in fact, was in prison during the termination hearing) since Children's placement; and, the parties lived in two different counties that each ordered Mother to comply with separate family service plans in order to reunify with Children. It appears that transferring jurisdiction of this matter has complicated CYS' ability to have its issued reviewed on appeal. **See supra** at n.27.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

DATE: 05/06/2024