J-S80001-18

2019 PA Super 85

| IN RE: ADOPTION OF: B.G.W. | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|
| APPEAL OF: S.R.R. AND M.F.R., II | No. 2625 EDA 2018 |

Appeal from the Order Entered August 8, 2018
In the Court of Common Pleas of Montgomery County
Orphans' Court at No(s): 2017-A0100

BEFORE: BENDER, P.J.E., BOWES, J., and NICHOLS, J.

OPINION BY BENDER, P.J.E.:                                 **FILED MARCH 21, 2019**

S.R.R. (Adoptive Mother) and M.F.R., II (Adoptive Father) (collectively Adoptive Parents) appeal from the August 8, 2018 order that granted E.A.W.'s (Birth Mother) petition to enforce the Post Adoption Contact Agreement (PACA), which was entered into by the parties in regard to E.S.R. (Child),[1] born in April of 2017. After review, we affirm.

This matter involves a private voluntary adoption of Child that was coordinated by Haven Adoptions. Child was placed with Adoptive Parents when she was two days old. Following the submission of the proper consents, the trial court issued the final decree confirming consents on July 31, 2017. Although a motion was filed to stay the adoption with corresponding preliminary objections, these documents were withdrawn and, following a hearing on the adoption petition, the adoption was finalized and the PACA was executed. The parties acknowledged that they entered into the PACA

_____

[1] E.S.R. was formerly known as B.G.W.

voluntarily, knowingly and intelligently. The relevant portions of the PACA provide:

> (2) Visitation: Visits shall occur at least THREE (3) times per year, with one of the visits to take place around the time of [] [C]hild's birthday. Visits shall be arranged by and between the Adoptive Parents and [Birth Mother]. The visits shall be for at least 2 hours until [] [C]hild is 3 years old, unless the parties agree to an alternative time period. … Unless otherwise agreed, all visits shall occur within Montgomery County, PA.
>
> (3) … All [p]arties will conduct themselves appropriately during visitation and will not engage in any disputes or harsh language. No [p]arty shall ever speak negatively about any other [p]arty to this agreement (or any relatives who are not [p]arties to the agreement) to [] [C]hild or allow any other person to do so while in the presence of [] [C]hild. All parties recognize and support the concept that a good relationship between them and their families is certainly best for [] [C]hild. Appropriate behavior, given all the issues involved for a child who joins a family through adoption, shall be utilized by all parties at all times. Should any negative or inappropriate behavior occur, then in that event, for that particular visit, the Adoptive Parents may terminate that particular visit. It is anticipated that all parties will put [] [C]hild's welfare and best interest first and all parties will engage in appropriate behavior.

Trial Court Opinion (TCO), 9/20/18, at 2 (quoting the PACA at 4-5).

Based upon the testimony provided at the hearing held on August 8, 2018, in response to Birth Mother's petition, the trial court set forth factual findings in its opinion, stating:

> The first visit following the execution of the PACA occurred April 29, 2018. The visit occurred at an agreed upon location called The Little Pod in North Wales, Pennsylvania. Adoptive [P]arents were present with [Child] as well as [B]irth [M]other and her mother.
>
> Two days later, [B]irth [M]other wrote a letter to the [c]ourt requesting enforcement of the PACA based upon events that occurred during this visit. This letter was filed with the

Montgomery County Orphans' Court as a Petition. A Rule to Show Cause Why the PACA Should Not Be Enforced was entered for June 19, 2018. *See*, 23 Pa.C.S. §[]2738(a). Thereafter, this [c]ourt scheduled a one-half day hearing to hear Petition To Enforce the PACA on August 8, 2018.

During the August 8th hearing, [B]irth [M]other testified that she and her mother arrived at the Little Pod first and waited near the food area. [Adoptive Father] completely ignored [B]irth [M]other when he walked into the building and took [] [C]hild to the play area. [Adoptive Mother] approached [B]irth [M]other [and] told them 'they were going to play over there' and walked away. Birth [M]other followed [Adoptive Mother] to the play area and approached [Adoptive Father,] who was holding the child. As she reached out to say hello and touch [Child], the [A]doptive [F]ather pulled [] [C]hild away and said that 'there would be no direct contact; there will be no touching; we are concerned for her safety'. When asked what the safety concerns were, [A]doptive [F]ather would just repeat 'we are concerned for her safety' and then told [Birth Mother] that he did not have to explain himself to [her] and he was the parent and what he said went. NT, 8/8/18, p. 8-9; 35-42. Whenever [B]irth [M]other tried to approach [] [C]hild, [A]doptive [F]ather would continually block her with his body or would pick [] [C]hild up and move her away from [B]irth [M]other. The only time [B]irth [M]other was able to approach [] [C]hild was when [Adoptive Father] was not present. Birth [M]other testified that out of the two (2) hour visit, she had approximately forty (40) minutes of interaction with [] [C]hild. NT, 8/8/18, p. 10.

[Adoptive Father] did not dispute [B]irth [M]other's testimony. He maintained that he kept [] [C]hild from [B]irth [M]other out of safety concerns for [] [C]hild. When asked repeatedly what these safety concerns were, he would simply cite concerns of [] [C]hild falling or getting hurt to justify not allowing [] [B]irth [M]other to have physical contact with [] [C]hild. NT, 8/8/18, p. 31-42.

The following are excerpts of [Adoptive Father's] testimony while being questioned by counsel for [B]irth [M]other[,] which this [c]ourt found significant:

> By Counsel: ... So in that belief and in the maintenance of the relationship, wouldn't it make

sense that these visits include physical contact and interaction?

[Adoptive Father]: Interaction, yes. Physical contact, no. I am not going to force it on my daughter. I am not going to force someone to kiss or hold or touch her. I don't believe that's appropriate.

Counsel: I am not asking you whether to force it. But rather would you find it acceptable that in a visit if my client was to extend her hand to your daughter and touched that hand, is that appropriate?

[Adoptive Father]: That's fine and that occurred.

Counsel: And so physical touch, if my client was - or your daughter was to walk up to my client and approach my client and my client picked her up, that would be appropriate?

[Adoptive Father]: No.

Counsel: Why is that not appropriate?

[Adoptive Father]: Again, going back to her safety. You know, there is certain [*sic*] when you are around infants and things like that and toddlers, you know, you need to be very careful how you pick them up and know what you are doing.

NT[,] 8/8/18, pp. 34-35.

Counsel: So if my client is being able to interact and touch her [Child] and she is accepting of that, what is the harm to her? What is the harm to [Child]?

[Adoptive Father]: Again, I need a specific. I don't know what you mean by interaction. Give me an example. If she is running around and she wants to, you know, pick her up or [Child] is stumbling, what are you talking about? You are asking me for a yes or no answer, but there is not an example of what you are speaking of. That's why I am confused....

> Counsel: Let me say that if my client extends her hand out to your daughter and your daughter extends her hand and hops up in her lap, is that going to be harmful to your daughter?
>
> [Adoptive Father]: Potentially, sure.
>
> Counsel: And how is that?
>
> [Adoptive Father]: What if she hops up and falls off? A lot of ifs can happen. Anything is potential. I don't know what else to say.

> NT, 8/8/18, p. 41-42.

> [Adoptive Father] simply failed to provide any reasonable or logical explanation as to what safety concerns he has with [B]irth [M]other having physical contact with [Child]. Interestingly, [Adoptive Father] acknowledged in his testimony that prior to the finalization of the adoption and the execution of the PACA, he and his wife would allow [B]irth [M]other] to hold [Child]. NT, 8/8/18, p. 31. Yet, [Adoptive Father] insisted his behavior was justified during the April 29th visit and he was compliant with the terms of the PACA. NT, 8/8/18, p. 48-49.

TCO at 3-5.

The trial court further explained that its resulting order, enforcing the PACA, directed "that the visits involve interaction and communication, including touching." *Id.* at 5. The court also ordered "that the next visit shall be supervised by a neutral third party…." *Id.* Additionally, the court stated that although the PACA did not include this specific language, such behavior was implicit in the agreement, particularly, because that behavior was acceptable prior to the parties' entering into the PACA. The court concluded that

[t]hese visits between [B]irth [M]other and [Child] should not be likened to a prison visit, where touching and physical interaction is prohibited, as analogized by counsel for [Adoptive Father]. NT, 8/8/18, p.46. More appropriately, this [c]ourt cannot imagine an ongoing relationship with [B]irth [M]other that does not include communication and physical interaction. The fact that this [c]ourt must spell this out to [] [A]doptive [F]ather is troubling.

*Id.* at 6.

Following the entry of the August 8, 2018 order, Adoptive Parents filed the instant appeal to this Court, and now raise three issues for our review:

> A. Did the [c]ourt err and abuse its discretion by defining visits between [] [C]hild and [] [Birth mother in its August 8, 2018 [o]rder as to include "touching" when the [PACA] did not specify touching?
>
> B. Did the [c]ourt err and abuse its discretion by deeming [Birth Mother's] May 1, 2018 correspondence[,] which specifically requested a modification of the [PACA] to eliminate [A]doptive [F]ather from the visits and requested a supervisor in the visits as constituting a request for enforcement of the [PACA]?
>
> C. Did the [c]ourt err and abuse its discretion by adding in its August 8, 2018 [o]rder a direction that the next visit needed to be supervised by a neutral third party, which was the modification [Birth Mother] requested where the statute, 23 Pa.C.S. § 2737(a), specifically states that only adoptive parents or children can request modification?

Adoptive Parents' brief at 8.

Although this appeal does not involve either a termination of parental rights or a dependency action, we recognize that the following excerpt from *In re C.M.C.*, 140 A.3d 699 (Pa. Super. 2016), provides guidance for the application of a proper standard of review.

> [A]ppellate courts must apply an abuse of discretion standard when considering a trial court's determination of a petition for termination of parental rights. As in dependency cases, our standard of review requires an appellate court to accept the findings of fact and credibility determinations of the trial court if they are supported by the record. *In re: R.J.T.*, … 9 A.3d 1179, 1190 ([Pa.] 2010). If the factual findings are supported, appellate courts review to determine if the trial court made an error of law or abused its discretion. *Id.*; *[In re:] R.I.S.*, … 36 A.3d 567, 572 ([Pa.] 2011) (plurality opinion)[]. As has been often stated, an abuse of discretion does not result merely because the reviewing court might have reached a different conclusion. *Id.*; *see also Samuel Bassett v. Kia Motors America, Inc.,* … 34 A.3d 1, 51 ([Pa.] 2011); *Christianson v. Ely*, … 838 A.2d 630, 634 ([Pa.] 2003). Instead, a decision may be reversed for an abuse of discretion only upon demonstration of manifest unreasonableness, partiality, prejudice, bias, or ill-will. *Id.*
>
> As we discussed in *R.J.T.*, there are clear reasons for applying an abuse of discretion standard of review in these cases. We observed that, unlike trial courts, appellate courts are not equipped to make the fact-specific determinations on a cold record, where the trial judges are observing the parties during the relevant hearing and often presiding over numerous other hearings regarding the child and parents. *R.J.T.*, … 9 A.3d at 1190. Therefore, even where the facts could support an opposite result, as is often the case in dependency and termination cases, an appellate court must resist the urge to second guess the trial court and impose its own credibility determinations and judgment; instead we must defer to the trial judges so long as the factual findings are supported by the record and the court's legal conclusions are not the result of an error of law or an abuse of discretion. *In re Adoption of Atencio*, … 650 A.2d 1064, 1066 ([Pa.] 1994).

*In re C.M.C.*, 140 A.3d at 704.

Furthermore, the *In re C.M.C.* decision set forth the following in regard to a revocation of consent to adoption in connection with a voluntary relinquishment of parental rights:

- 7 -

When reviewing a decree entered by the [o]rphans' [c]ourt, this Court must determine whether the record is free from legal error and the court's factual findings are supported by the evidence. Because the [o]phans' [c]ourt sits as the fact-finder, it determines the credibility of the witnesses, and on review, we will not reverse its credibility determinations absent an abuse of discretion.

*Id.* at 705 (quoting **In re K.G.M.**, 845 A.2d 861, 863 (Pa. Super. 2004)). Accordingly, we conclude that these provisions apply to the present situation.

Initially, we note that Adoptive Parents' argument section of their brief discusses the issues they have raised in a different order than the issues as they are listed in their statement of questions involved. We will address the issues in the order that they are presented in Adoptive Parents' argument section of their brief.

Therefore, we begin with Adoptive Parents' contention that the court erred by characterizing Birth Mother's letter/petition sent to the court as a request for enforcement of the PACA rather than a modification when asking that Adoptive Father not be present at the visits and that a social worker or mediator attend. Adoptive Parents cite the following pertinent sections of the Adoption Act:

**§ 2737. Modification of agreement**

**(a) General rule.**—Only the adoptive parent or a child who is 12 years of age or older may seek to modify an agreement by filing an action in the court that finalized the adoption.

. . .

**§ 2738. Enforcement of agreement**

- 8 -

**(a)** **General rule.**—Any party to an agreement, a sibling or a child who is the subject of an agreement may seek to enforce an agreement by filing an action in the court that finalized the adoption.

**(b)** **Remedies.**—Any party to an agreement, a sibling or a child who is the subject of an agreement may request only specific performance in seeking to enforce an agreement and may not request monetary damages or modification of an agreement.

23 Pa.C.S. § 2737(a) and § 2738(a), (b).

With reliance on these sections of the Act, Adoptive Parents argue that Birth Mother's letter/petition requested modification, not enforcement, of the PACA, and that Birth Mother did not have standing to request modification. Rather, they contend that only they may request modification of the PACA. Moreover, Adoptive Parents point out that although a *pro se* litigant's filings shall be liberally construed, Birth Mother "is not entitled to any particular advantage because she lacks legal training." Adoptive Parents' brief at 19 (citing ***O'Neill v. Checker Motors Corp.***, 567 A.2d 680, 682 (Pa. Super. 1989)). Adoptive Parents also assert that "any layperson choosing to represent [herself] in a legal proceeding must, to some reasonable extent, assume the risk that [her] lack of expertise and legal training will prove [her] undoing." ***Id.*** (citing ***Vann v. Unemployment Compensation Board of Review***, 494 A.2d 1081, 1086 (Pa. 1985)).[2]

---

[2] Although Birth Mother wrote the letter/petition sent to the trial court herself without the aid of counsel, she was represented by counsel at the August 8, 2018 hearing and throughout this appeal. However, during the negotiations relating to the creation of the PACA, she was acting *pro se*.

In response, Birth Mother asserts that Orphans' Court Rule 1.2 (O.C.R.) directs that the applicable rules "shall be liberally construed to secure the just, timely and efficient determination of every action or proceeding to which they are applicable" and that "[t]he court at every stage of any action or proceeding may disregard any error or defect of procedure that does not affect the substantive rights of the parties in interest." Based on this language, Birth Mother contends that the court "liberally construed Birth Mother's letter as a pleading seeking enforcement of the PACA regardless of Birth Mother's choice of the word 'modify.'" Birth Mother's brief at 6. Moreover, Birth Mother identifies the following language from the PACA upon which she contends she reasonably relied:

> The Parties hereby understand and acknowledge that they may have a right pursuant to the Adoption Act, to seek to modify, enforce, and/or discontinue this Agreement. Such rights are as set forth in the Adoption Act of Pennsylvania. Should any Party make a request to the court to modify or enforce this Agreement, then any changes made or approved by the [c]ourt in response, would thereafter also be legally enforceable.

PACA at § B.2.

Essentially, Birth Mother believes that she had the right to request that the court assist her and require the Adoptive Parents to comply with the dictates of the PACA. She also directs this Court's attention to the absence of an objection raised by Adoptive Parents to Birth Mother's standing, an issue that they never raised below. Therefore, Birth Mother claims that Adoptive Parents waived this issue.

With regard to the sole remedy of specific performance, Birth Mother contends that her letter/petition centered on Adoptive Father's actions at the April 29, 2018 visit. Therefore, she claims that the thrust of her description of what occurred at the visit supported her request to the court for specific performance of the PACA by requiring that Adoptive Father not attend future visits or require a third party to attend the visits or that Adoptive Parents be required to act appropriately. Lastly, Birth Mother asserts that she was not asking that the language of the PACA be changed, only that the Adoptive Parents' actions be in compliance with the PACA as written.

Following our review of the record in this case, we first conclude that Adoptive Parents waived this issue in that they did not object to Birth Mother's standing in the court below. *See* Pa.R.A.P. 302 ("Issues not raised in the lower court are waived and cannot be raised for the first time on appeal."). Even if waiver is not the outcome as to this issue, Adoptive Parents' position does not convince us that the court erred in its determination that Birth Mother was requesting enforcement, not modification. The single use of the word "modify" in Birth Mother's letter/petition does not override the three-page description of what occurred at the visit. Moreover, within the bounds of our standard of review, we conclude that the trial court did not abuse its discretion or err as a matter of law in its interpretation of the letter/petition, particularly, after hearing testimony at the August 8, 2018 hearing. It is evident that the court's order was an attempt to require Adoptive Parents to comply with the

PACA, which the parties had entered into voluntarily. Adoptive Parents are not entitled to relief pursuant to this argument.

Adoptive Parents' next issue centers on the trial court's determination that the next visit must include a neutral third party to supervise the actions of the parties. Again, Adoptive Parents contend that the court order requiring the presence of a third party to supervise the visit was requested by Birth Mother and results in a modification of the PACA that can only be requested by them. This argument mirrors Adoptive Parents' position presented in the first issue, that Birth Mother cannot request a modification. Having concluded that the court did not err by finding that Birth Mother was requesting enforcement, we determine that this argument does not provide them with relief.

Additionally, the court heard testimony from the parties and found that Adoptive Father's responses to questions posed to him were evasive. TCO at 5. Specifically, the court explained that "[g]iven the evasive and unfounded nature of [Adoptive Father's] responses, this [c]ourt felt it was necessary to spell out what is to occur during these visits to avoid the parties returning to court again." *Id.* This statement explains the basis for the court's credibility determinations and is clearly supported by the evidence of record. Therefore, we conclude that the court had the discretion to order supervision of the next visit for the best interest of Child. Moreover, the language of the PACA does not prohibit such action.

Adoptive Parents' final argument centers on the court's determination that the visits between Birth Mother and Child would include "touching" when the PACA did not specify that this conduct was allowed. To support their position, Adoptive Parents contend that contract principles apply and that to interpret the language of the PACA, "the intention of the parties is a paramount consideration." Adoptive Parents' brief at 23 (quoting **Profit Wize Marketing v. Wiest**, 812 A.2d 1270, 1274 (Pa. Super. 2002)). They also note that words in a contract, if not defined, are to be "construe[d] in accordance with their natural, plain and ordinary meaning." **Id.** at 24 (quoting **Codero v. Potomac Ins. Co.**, 794 A.2d 897, 900 (Pa. Super. 2002)). Moreover, they argue that a court can "not modify the plain meaning of words under the guise of interpretation…." **Id.** (citing **Meeting House Lane, Ltd. V. Melso**, 628 A.2d 854, 857 (Pa. Super. 1993)).

Relying on this caselaw, Adoptive Parents contend that when the parties negotiated the terms of the PACA, they could include the terms they desired with appropriate definitions. Although they acknowledge that the parties did not define the term visit, they did not contemplate that the visits would include touching. Adoptive Parents' discussion then provides definitions of the term "visit," explaining it means to see a person or thing. Based on this definition, they argue that the court did not merely interpret the term "visit," but modified its meaning to include "touching," which they contend interferes with their personal choice in matters of family life and their decision relating to the

protection and safety of their child. Thus, Adoptive Parents assert that the trial court abused its discretion by defining the term "visit" to include touching.

We disagree. As noted previously, the court found that although the PACA did not include the specific term touching, "such interaction is implicit in the agreement given that the behavior was acceptable prior to the PACA and both [Adoptive Parents] and [B]irth [M]other agreed, by signing this PACA, that it was in [] '[C]hild's best interest to have an ongoing relationship with [B]irth [M]other.'" TCO at 5-6. We conclude that this interpretation of the language of the PACA is reasonable and that the trial court did not abuse its discretion in ordering that touching was to be considered a part of the visits.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 3/21/19