J-A04042-25            2025 PA Super 91

| IN RE: ADOPTION OF: S.A.S., A MINOR | : | IN THE SUPERIOR COURT OF PENNSYLVANIA |
|---|---|---|
| | : | |
| | : | |
| APPEAL OF: D.S. | : | |
| | : | |
| | : | |
| | : | |
| | : | |
| | : | No. 1372 MDA 2024 |

Appeal from the Order Entered August 22, 2024
In the Court of Common Pleas of York County
Orphans' Court at No(s): 2017-0057a

BEFORE: LAZARUS, P.J., NICHOLS, J., and SULLIVAN, J.

OPINION BY SULLIVAN, J.:                    **FILED: APRIL 23, 2025**

D.S. ("Maternal Grandmother") appeals from the order terminating the post-adoption contact agreement[1] ("PACA") between her and J.H. ("Adoptive Mother")[2] concerning S.H.[3] ("Child"), who is now thirteen years old. In this matter of first impression, we affirm.

We take the underlying facts and procedural history in this matter from the Orphans' Court opinion:

> This case involves Child, [], who was adopted on January 23, 2018[,] by [Adoptive Mother] when she was six years old, after [both] her parents' parental rights were involuntarily terminated. [] Adoptive Mother[] and Maternal Grandmother

---

[1] *See* 23 Pa.C.S.A. §§ 2731-2742.

[2] Adoptive Mother is Child's paternal grandmother. Child was adopted by both paternal grandparents; however, adoptive father committed suicide in 2023. *See* N.T., 8/21/24, at 32.

[3] This case is captioned under the original adoption caption. Post-adoption, the child's name changed from S.A.S. to S.H. Therefore, we use the Child's current name in the body of this opinion.

entered [] a PACA, which the court approved on January 23, 2018, enabling Maternal Grandmother to have visits with Child. Under the agreement, Maternal Grandmother was granted [visitation with] Child every other weekend from Saturday at 10:30 a.m. to Sunday at 11:00 a.m.[4] The agreement provided that Maternal Grandmother was not to allow any contact with Biological Mother, B.S. [("Biological Mother")]. The PACA did not restrict Adoptive Mother from permitting contact with Biological Parents in the future.

Child is autistic and was largely non-verbal at the time of adoption. Child's ability to communicate has greatly improved over the years. As required by the PACA, Child visited Maternal Grandmother on alternating weekends from January 2018 until January 2024 when at the age of . . . 12, Child no longer wanted to visit Maternal Grandmother. On March 27, 2024, Adoptive Mother filed a petition to terminate the PACA, alleging that visits with Maternal Grandmother were causing Child stress because Maternal Grandmother discussed Biological Mother with Child and had recorded [Child]. At a hearing on May 3, 2024, the Parties reached a tentative agreement to allow Maternal Grandmother to continue seeing Child with reduced times. The court noted that Child is autistic and that no one had quite ascertained what her concerns [were] regarding seeing Maternal Grandmother. Thus, the [p]arties agreed to continue the matter until August 21, 2024, and the court ordered Adoptive Mother to have Child work with a therapist to ascertain Child's concerns and to see if therapeutic visits might be accomplished by August 21, 2024. The PACA remained in effect although [the p]arties agreed not to force Child to see Maternal Grandmother. When no therapeutic visits had been arranged by August 12, 2024, Maternal Grandmother filed a petition for contempt and for special relief, seeking family counseling with Maternal Grandmother and Child in cooperation with Child's therapist with a goal of working toward reinstatement of Maternal Grandmother's [visitation rights].

On August 21, 2024, the court held a hearing on Maternal Grandmother's contempt petition and on Adoptive Mother's petition to terminate the PACA. Regarding the contempt petition,

---

[4] At some point, by agreement of the parties, the visits were extended until 6:00 p.m. on Sundays. *See* N.T., 8/21/24, at 29.

the court found [Adoptive] Mother in contempt for having stopped the Child's visits since January 7, 2024.[5]  However, the court terminated the PACA.

Orphans' Court Opinion, 10/22/24, at 1-3 (record citations omitted, footnotes added).

At the August 2024, hearing, the court heard the testimony of Child's therapist, Kristina Crippen ("Crippen"), Adoptive Mother, and Maternal Grandmother, and interviewed Child *in camera* outside the presence of counsel.[6]  The court subsequently issued an order terminating the PACA. Maternal Grandmother filed a motion for reconsideration, which the court denied.  This timely appeal followed.[7]

On appeal, Maternal Grandmother raises four issues for our review:

1. Whether the [Orphans' C]ourt abused its discretion and/or erred as matter of law when it terminated the PACA in that Adoptive Mother failed to establish any of the facts pleaded in her Petition to Discontinue PACA[?]

2. Whether the [Orphans' C]ourt abused its discretion and/or erred as matter of law when it terminated the PACA in that Adoptive Mother failed to establish by clear and convincing evidence that discontinuing the PACA serves the needs, welfare, and best interest of Child[?]

_____

[5] Adoptive Mother did not appeal the finding of contempt.

[6] It is not apparent whether the Orphans' Court recorded the interview.  The certified record does not include any transcription of it.  However, neither party has disputed the Orphans' Court's summarization of Child's remarks, and therefore the lack of a transcript does not hamper our review.

[7] Maternal Grandmother and the Orphans' Court complied with Pa.R.A.P. 1925.

3. Whether the [Orphans' C]ourt abused its discretion [in terminating the] PACA in that Adoptive Mother and Grandmother had reached an agreement to continue contact, which agreement was made of record on May 3, 2024[?]

4. Whether the [Orphans' C]ourt abused its discretion and/or erred as a matter of law when it terminated the PACA in failing to grant reconsideration?

Maternal Grandmother's Brief at 5-6.

Maternal Grandmother's first three issues concern the Orphans' Court's decision to terminate the PACA. Accordingly, we address them together.

We begin by noting there is a paucity of law in Pennsylvania concerning PACAs, and the parties provide competing assertions of our standard and scope of review. Maternal Grandmother asserts this case involves a pure question of law and, therefore, our standard of review is *de novo* and our scope of review is plenary. **See** Maternal Grandmother's Brief at 3. By contrast, Adoptive Mother asserts we must apply the abuse of discretion standard of review this Court uses to assess an Orphan's Court decree. **See** Adoptive Mother's Brief at 1-2.

After a review of the pertinent law, we find that the abuse of discretion standard of review applies. In *In re Adoption of B.G.W.*, 206 A.3d 576 (Pa. Super. 2019), this Court recognized no case had addressed the appellate standard of review of a PACA and, after consideration, determined an abuse of discretion standard applies to determining whether the Orphans' Court

- 4 -

erred in enforcing a PACA. *See id*. at 581-82.[8] Similarly, in *In re Adoption of A.M.C.*, 321 A.3d 973 (Pa. Super. 2024) (unpublished memorandum),[9] this Court again applied the abuse of discretion standard to review the Orphans' Court's denial of a biological mother's petition to enforce a PACA. *See id*. at *2. We see no reason to apply a different scope and standard of review to a petition to **terminate** a PACA than we apply to a petition to **enforce** one. Moreover, Maternal Grandmother's sole purported authority, *Matter of Adoption of C.A.F.*, 168 A.3d 330 (Pa. Super. 2017) (unpublished memorandum), is an unpublished memorandum dated prior to May 1, 2019, that by rule cannot properly be cited for any purpose. *See* Pa.R.A.P. 126(b). We decline to consider it.[10]

Thus, we review the Orphans' Court's order for an abuse of discretion:

When reviewing a decree entered by the Orphans' Court, this Court must determine whether the record is free from legal error and whether the court's factual findings are supported by the evidence. Because the Orphans' Court sits as the fact-finder, it determines the credibility of witnesses, and on review, we will not

---

[8] *See also In re Adoption of A.W.*, 230 A.3d 1139, 1143 (Pa. Super. 2020), (applying abuse of discretion standard to assess Orphans' Court decision that a biological mother's voluntary termination of her parental rights conditioned upon the entry of a PACA was not made voluntarily).

[9] *See* Pa.R.A.P. 126(b) (unpublished non-precedential memoranda decision of Superior Court filed after May 1, 2019, may be cited for persuasive value).

[10] We note that in *In re Adoption of S.Y.*, 264 A.3d 385 (Pa. Super. 2021) (unpublished memorandum), a case not cited to by Maternal Grandmother, this Court did apply the *de novo*/plenary standard. *See id*. at *4. However, *S.Y.* involved a pure question of statutory interpretation, namely whether the process used in that case complied with 23 Pa.C.S.A. §§ 2733 and 2735. *See id*. at **8-9. By contrast, this case concerns an issue of fact, not law.

reverse its credibility determinations absent an abuse of that discretion.

***In re Adoption of A.W.***, 230 A.3d 1139, 1143 (Pa. Super. 2020) (citation and brackets omitted).

A PACA is a statutory creation, which allows adoptive parents and birth relatives to participate in ***voluntary*** post-adoption contact agreements. ***See*** 23 Pa.C.S.A. §§ 2731-2742; ***see also Adoption of A.W.***, 230 A.3d at 1144 (stating "an adoptive parent ***is not required*** to allow post-adoption contact." (emphasis added)). Section 2731 provides:

> The purpose of this subchapter is to provide ***an option*** for adoptive parents and birth relatives to enter into a ***voluntary agreement*** for ongoing communication or contact that:
>
> (1) ***is in the best interest of the child***;
>
> (2) recognizes the parties' interests and desires for ongoing communication or contact;
>
> (3) is appropriate given the role of the parties in the child's life; and
>
> (4) is subject to approval by the courts.

23 Pa.C.S.A. § 2731 (emphases added).

If the parties elect to enter a PACA under Subchapter D of the Adoption Act, the agreement "shall be filed with the court that finalizes the adoption of the child." ***Id***. at § 2735(a). The court "shall approve the agreement" if the conditions for approval identified in section 2735(b) are satisfied. Those conditions are:

(1) The agreement has been entered into knowingly and voluntarily by all parties. An affidavit made under oath must accompany the agreement affirmatively stating that the agreement was entered into knowingly and voluntarily and is not the product of coercion, fraud or duress. The affidavit may be executed jointly or separately.

(2) **The agreement is in the best interest of the child**. In making that determination, factors that the court may consider include, but are not limited to, the following:

(i) The length of time that the child has been under actual care, custody and control of a person other than a birth parent and the circumstances relating thereto.

(ii) The interaction and interrelationship of the child with birth relatives and other persons who routinely interact with the birth relatives and may significantly affect the child's best interests.

(iii) The adjustment to the child's home, school and community.

(iv) **The willingness and ability of the birth relative to respect and appreciate the bond between the child and prospective adoptive parent.**

(v) The willingness and ability of the prospective adoptive parent to respect and appreciate the bond between the child and the birth relative.

(vi) Any evidence of abuse or neglect of the child.

23 Pa.C.S.A. § 2735(b) (emphases added). Further, "[a]n agreement shall not be legally enforceable unless approved by the court." 23 Pa.C.S.A. § 2735(c).

The Adoption Act further provides a PACA may be discontinued by either a party to the PACA or a child at least 12 years of age, by "filing an action in the court that finalized the adoption." 23 Pa.C.S.A. § 2739(a). The court may

discontinue the PACA if it finds "by clear and convincing evidence that discontinuance serves the needs, welfare and best interest of the child." 23 Pa.C.S.A. § 2739(b). "The standard of clear and convincing evidence is defined as testimony that is so clear, direct, weighty, and convincing as to enable the trier of fact to come to a clear conviction, without hesitance, of the truth of the precise facts in issue." *Interest of K.T.*, 324 A.3d 49, 56-57 (Pa. Super. 2024) (citations and internal quotation marks omitted).

The United States Supreme Court has recognized that "the interest of parents in the care, custody, and control of their children . . . is perhaps the oldest of the fundamental liberty interests recognized by this Court." *Troxel v. Granville*, 530 U.S. 57, 65 (2000). "Mindful of this fundamental right, our law presumes that parents are fit and make decisions in their children's best interest, absent factors such as abuse, neglect, or abandonment." *K.W. v. S.L.*, 157 A.3d 498, 503 (Pa. Super. 2017) (internal quotation marks and citation omitted). A PACA infringes upon this fundamental right. *See id*. (declaring that allowing third parties to seek custodial rights burdens the fundamental rights of parents). A PACA can only exist for a child twelve years old or older when adoptive parents enter a voluntary agreement with the biological relatives, the child consents, the court approves, and it is in the best interests of the child to maintain some contact with biological relatives, who are legal strangers once an adoption is finalized. *See* 23 Pa.C.S.A. § 2731. The Adoption Act recognizes a PACA may become detrimental and allows for

its termination, as noted above. Thus, a PACA is not the equivalent of a custody agreement and confers no legal or physical custodial rights on the biological relatives beyond the express terms of the agreement.

Bearing these principles in mind, we turn to Maternal Grandmother's arguments. Maternal Grandmother contends Adoptive Mother did not plead sufficient facts to show by clear and convincing evidence that discontinuance of the PACA served the needs, welfare, and best interests of the Child. *See* Maternal Grandmother's Brief at 15-18. She also maintains the Orphans' Court erred in finding the cumulative evidence showed discontinuance served the needs, welfare, and best interests of the Child. *See id*. at 18-22. Lastly, she avers the trial court erred by disregarding the parties' tentative limited visitation agreement following the filing of Adoptive Mother's petition to terminate the PACA. *See id*. at 22-23.

The Orphans' Court concluded the continuance of visitation was not in Child's best interests:

> At the hearing . . ., the court heard testimony from Child's therapist [Crippen], who has been seeing Child for about an hour every two weeks since May 30, 2024. [] Crippen worked on helping Child to identify her feelings and to express them. [] Crippen testified to her belief that contact with Maternal Grandmother would not be beneficial or in Child's best interest at this time.
>
> * * * * *
>
> [] Crippen testified similarly when questioned about the possibility of therapeutic visits.
>
> * * * * *

When asked about reunification therapy, [] Crippen indicated that she could not recommend it now, but perhaps in the future. [] Crippen testified that Child **had been traumatized by the last visit with Maternal Grandmother**.

Orphans' Court Opinion, 10/22/24, at 3-4 (record citations omitted, emphasis added).

The court continued:

> The [Orphans'] Court interviewed Child *in camera* without attorneys and by their agreement. Child was very communicative and expressive, and enjoyed sitting with the court's therapy dog, Philly[,] during the interview. Child communicated that she does not want to go to visit Maternal Grandmother because she has trust issues and panic attacks regarding visits. Child communicated that she does not wish to see Maternal Grandmother until she is around sixteen years of age. Child told the court that she only had panic attacks when she was with Maternal Grandmother. Child indicated that she was upset that Maternal Grandmother recorded her, took pictures of her, and sent them to Biological Mother. Child indicated that even if [Maternal] Grandmother promised not to record her or talk about Biological Mother, she would not trust that. Child is concerned that Maternal Grandmother may actually attempt to talk about Biological Mother again. Child indicated that she does not trust Maternal Grandmother at this time.

*Id*. at 4.

The Orphans' Court also summarized the testimony of Adoptive Mother:

> Adoptive Mother also testified that after Maternal Grandmother dropped Child off from the subject visit in January 2024, Child started crying, complaining about Maternal Grandmother discussing Biological Parents and recording her, which correlates with what Child told the court. Adoptive Mother texted Maternal Grandmother to inquire what had happened and Maternal Grandmother indicated concern for whether negative comments were being made about Biological Mother at Adoptive Mother's home and indicated that she told Child "to keep praying that her [biological] **parents** figure out what they want and make

- 10 -

it happen[.]" . . .. Maternal Grandmother indicated she was recording Child in relation to her concerns regarding her medication. After that visit, Child stopped going to see Maternal Grandmother, and Adoptive Mother testified that Child gets really anxious, cries, and just shuts down at the thought of seeing Maternal Grandmother. Adoptive Mother testified that Child told her she would be willing to reassess whether she felt safe to visit Maternal Grandmother when she is sixteen. Adoptive Mother does not know why Child has chosen that particular age, but it is what Child and her therapist have discussed. Adoptive Mother also testified that about a year prior to the incident with Maternal Grandmother, Adoptive Father committed suicide. Adoptive Mother testified that Child was seeing a therapist through Dr. [Linda] Blasé [her primary care physician] because she was distraught and that she was getting better with opening up when the conversation with Maternal Grandmother caused Child to go downhill.

*Id*. at 5 (record citations omitted, emphasis in original).

Lastly, the Orphans' Court stated:

Maternal Grandmother testified that her last weekend with Child was just a normal weekend. Maternal Grandmother testified that she only videotaped Child because Child said she felt that she had been having side effects from her medication and wanted to tell the doctor and that her voice was not heard. Maternal Grandmother testified that she recorded Child on Saturday, more than twenty-four hours before Child was dropped off. Maternal Grandmother testified that she discussed Biological Parents with Child because Child was talking about the drama going on between them. Child sees her sister, the daughter of Biological Parents[,] when she visits Maternal Grandmother. Maternal Grandmother testified that she wanted to remain in contact with Child because Child "needs to have somebody that is giving her unconditional love." When Maternal Grandmother's counsel asked if she agrees that Adoptive Mother gives Child unconditional love, Maternal Grandmother stated, "I don't know. I am not around the two of them together."

At the close of the hearing, the court terminated the PACA and explained to Maternal Grandmother that she was insensitive to the fact that Child is on the autism [spectrum] and that adoptions that arise from terminations of parental rights are full

of contention and need to be handled very carefully and with sensitivity. The court explained to Maternal Grandmother that she was not sensitive to the Child and the confusion that can arise when a child has been adopted, as with continuing to refer to biological parents as ["mother"] and ["father"] when they are no longer Child's parents and discussions about them. The court explained that whatever was said, Maternal Grandmother has lost Child's trust, which the court hopes can be restored when Child turns sixteen, which will be voluntary on Child's part.

Orphans' Court Opinion, 10/22/24, at 5-6 (record citations omitted).

After a thorough review, the certified record fully supports the Orphans' Court's conclusion that there was clear and convincing evidence to support termination of the PACA. Child's treating therapist offered unequivocal and uncontradicted testimony that, at this time, continued contact between Maternal Grandmother and Child, was detrimental to Child, even in a therapeutic setting. *See* N.T., 8/21/24, at 9-11, 16-17. Crippen specifically testified:

> At this time, clinically, I don't think that contact with [Maternal Grandmother] would be beneficial for [Child] due to that fact that at a visit in January[,] [Child] claimed she was videoed and recorded, and photos were taken. And some questions were asked that [Child] can't remember, but said made her feel very uncomfortable.
>
> And so, when [Child] thinks about having to see [Maternal Grandmother] she is full of anxiety and a lot of emotions that she just does not want to be in that situation at this time. So, clinically, I don't see a benefit right now for her to have contact with her until [Child] can work through these feelings.

*Id*. at 9. Crippen explained that therapeutic visits would not be beneficial because Child "has broken down" when discussing even "the thought of having to have another visit with [Maternal Grandmother]." *Id*. Crippen averred it

was not clinically appropriate to have joint therapy sessions when Child "can't even keep herself together sometimes just trying to think about having another visit with [Maternal Grandmother]." *Id*. at 10. On cross-examination, Crippen reiterated that Child was not "emotionally . . . ready" for visits and that even therapeutic visits would be "emotionally detrimental" *Id*. at 16.

Crippen's testimony both regarding the events which occurred at the January 2024 visits, about Child's feelings about contact with Maternal Grandmother, and [Child's] wishes regarding future contact was consistent with both the testimony of Adoptive Mother and Child (as reported by the Orphans' Court). *See id*. at 22-24, 27-28; Orphans' Court Opinion, 10/22/24, at 4.

We perceive no abuse of discretion in the Orphans' Court ruling. At best, Maternal Grandmother's testimony and her actions during the January 2024 visit reflected a lack of understanding and sensitivity to Child's disability, the primacy of Child's relationship to Adoptive Mother, and the need not to involve Child in the problems occurring in her biological parents' lives. *See* N.T., 8/21/24, at 45-47, 49-50. At worst, Maternal Grandmother's actions were a deliberate attempt to interfere with Child's medical treatment and undermine her relationship with Adoptive Mother. *See id*.

Moreover, this is not a case where Adoptive Mother made only a token effort to comply with the PACA before seeking to discontinue it. *Compare*

***B.G.W.***, 206 A.3d at 584-85 (affirming Orphans' Court grant of petition to ***enforce*** a PACA where adoptive parents failed to comply with it beginning at the first visit). Rather, Adoptive Mother complied with the PACA for approximately ***six years***, and only sought termination after Maternal Grandmother's conduct significantly disturbed the twelve-year-old Child, who herself had the statutory right to seek termination of the PACA. ***See*** 23 Pa.C.S.A. §§ 2734, 2739.

Maternal Grandmother's arguments on appeal consist of viewing the evidence in the light most favorable to herself and asking this Court to reweigh the facts and disregard the Orphans' Court's credibility determinations. ***See*** Maternal Grandmother's Brief, at 17-23. This we cannot do. ***See Taylor v. Smith***, 302 A.3d 203, 210 (Pa. Super. 2023). Further, the evidence cited above meets the definition of clear and convincing evidence.

In her final issue, Maternal Grandmother contends the Orphans' Court erred in denying her motion for reconsideration. ***See*** Maternal Grandmother's Brief at 23-26. However, the Orphans' Court rules prohibit the filing of motions for reconsideration in matters under the Adoption Act. ***See*** Pa.R.O.C.P. 8.2(c). While Maternal Grandmother acknowledges Rule 8.2(c), she argues PACAs are not subject to it. ***See*** Maternal Grandmother's Brief, at 23-24. Maternal Grandmother fails to cite to any pertinent legal authority to support her position. We see no legal basis for allowing an exception to this

rule in PACA cases when the Orphans' Court rules specifically disallow them in other adoption matters.

Accordingly, for the reasons discussed above, we affirm.

Order affirmed.

Judgment Entered.

Benjamin D. Kohler, Esq.
Prothonotary

Date: 04/23/2025